34 C.C.P.A.(Patents)

### MABON v. SHERMAN et al.
### Patent Appeal No. 5264.

Court of Customs and Patent Appeals.
March 25, 1947.
Rehearing Denied May 16, 1947.

Watson, Cole, Grindle & Watson, of Washington, D. C. (Robert C. Watson, of Washington, D. C., Carl W. Weeks, of Niagara Falls, N. Y., and Harold F. Watson, of Washington, D. C., of counsel), for appellant.

Marston Allen, of Cincinnati, Ohio, for appellees.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

JACKSON, Associate Judge.

This is an appeal from a decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention of the subject matter of five counts to appellees.

The counts originated in a patent to appellant and read as follows:

"1. In a machine for separating the feed band portion of a record strip from the record receiving portion thereof along a weakened severance line therein, in combination, a pin feed unit having a row of pins for meshing with perforations through the feed band portion of said strip for propelling said strip in a direction parallel with said severance line, a guide adjacent said row of pins for guiding the feed band in proper relation with said pins, and a strip severing device adjacent to but laterally out of alignment with said row of pins and in the path of said severance line for progressively separating said feed band from said strip while said pin feed unit propels the strip in the feed direction.

"2. In a machine of the character described, in combination, feed mechanism for feeding a strip having a longitudinal feed band separated from the strip by a longitudinal weakened severance line, said feed mechanism including a traveling series of feed pins, a plurality of which simultaneously engage with apertures in said feed band at an elongated reach thereof, guide means for guiding said strip and feed band at said elongated reach, and a separator element transacting the course of the strip adjacent to said guide and having a dull blunt separating edge directed in line with said weakened severance line of the advancing strip.

"3. In a machine of the character described, in combination, means for guiding and feeding strip having pin feed apertures, said strip feeding means including feed pins positioned to engage in said feed apertures to effect strip feed, and a strip separator element secured in operative position adjacent to said feed pins when in strip feeding engagement and projecting into and through the course of the feeding strip.

"4. In a machine of the character described, in combination, means for guiding and feeding a strip having pin feed apertures arranged in a longitudinal series and having a longitudinal weakened severance line adjacent to the feed apertures, said strip feeding means including feed pins positioned to engage in said feed apertures to effect strip feed, and a strip separator element secured in operative position adjacent to said feed pins when in strip feeding engagement, and projecting into and through the course of the feeding strip, said separator element having a blunt separating edge directed along the line of said weakened severance line when the strip is fed by said feed pins against the separator element.

"5. In a machine of the character described, in combination, feed mechanism for feeding a strip having a longitudinal feed

band separated from the strip by a longitudinal weakened severance line, said feed mechanism including a traveling series of feed pins, a plurality of which simultaneously engages with apertures in said feed band at an elongated reach thereof, guide means for guiding said strip and feed band at said elongated reach, and a separator element transecting the course of the strip adjacent to the said guide and having a separating surface directed along the line of said weakened severance line as the strip is fed against the separator element."

The interference is between appellant's patent, No. 2,208,994, dated July 23, 1940, on an application, Serial No. 216,374, dated June 28, 1938, and an application of John Q. Sherman, deceased, by the executors of his estate, Serial No. 350,545, filed August 3, 1940, as a continuation-in-part of a Sherman application, Serial No. 279,341, filed June 15, 1939, which in turn is a division of Sherman application, Serial No. 116,552, filed December 18, 1936. A patent, No. 2,252,734, dated August 19, 1941, issued on application, Serial No. 279,341, and a patent, No. 2,172,414, dated September 12, 1939, issued on application, Serial No. 116,552.

The invention out of which the issue arises relates to the feeding of manifold record strips of paper through machines such as a writing or tabulating machine and particularly relates to the separation from the record strips, during feeding operation, a longitudinal side section of the strip known as a feed band in which apertures cooperate with the spokes of a revolving pin wheel.

Appellant in his preliminary statement alleged that the first drawings were made, the invention disclosed to others and a description thereof written early in the month of December 1936 and that additional drawings, including sketches and working drawings and additional disclosures to others were made after his first dates and prior to the filing of his application on June 28, 1938. Appellant further alleged that he began exercising reasonable diligence in adapting and perfecting the invention early in the month of December 1936.

Appellees alleged in their preliminary statement that the invention was conceived, disclosed to others, embodied in a full-sized machine and successfully operated during September 1924; that on the 23d day of December 1930, drawings were made of a further embodiment of the invention; that the first written description of said embodiment and disclosure to others were made on that date; that that embodiment was completed in a full-sized machine between July 1 and 15, 1931, and successfully operated on or about the latter date; that a third embodiment of the invention was in a full-sized machine, completed and successfully operated on October 4, 1933, on which date a drawing, written description and disclosure were made to others.

The interference as declared involved six counts and appellees were given the benefit of the two earlier Sherman applications. Appellant was, therefore, made the junior party and the burden was upon him of establishing priority of invention by a preponderance of the evidence. During the motion period he moved to dissolve the interference and also to shift the burden of proof. Both motions were denied by the Primary Examiner who, however, of his own motion dissolved the interference as to the method count 1. The remaining counts were thereafter renumbered 1 to 5, starting with original count 2. In order to avoid confusion the counts will be referred to as renumbered. Testimony was taken by both parties and many exhibits were introduced in evidence.

Appellant's motion for dissolution as to counts 2, 4 and 5 was based on the ground that they are unpatentable to appellees for the reason that the subject matter was anticipated by a patent to Metzner, No. 2,252,-720, dated August 19, 1941. The ground for dissolution as to counts 1 and 3 was alleged double patenting of their subject matter, it being contended that such matter was contained in claim 4 of the Sherman patent, No. 2,252,734. Counts 2, 4 and 5 were further challenged on the ground that Sherman had not filed the oath required by rule 94.

Appellant also moved to dissolve as to count 5, alleging that it contains a material structural variation limitation from claim 11 of his involved patent. The motion fur-

ther alleged public use for more than two years prior to the filing date of the involved application as a reason for dissolution.

The Primary Examiner, in his decision, pointed out that the Examiner of Interferences had ruled that the motion to dissolve be dismissed as far as the grounds of deficiency in the oath and public use were concerned and that he (the Primary Examiner), therefore, was bound by such ruling. He said, however, it was obvious that such oath was not required as appellees are entitled to the filing date of the parent case—December 18, 1936. He further stated that the question of public use may not properly be raised in interference proceedings leaving for decision by him the motion for dissolution on the grounds of unpatentability, double patenting and no interference in fact.

Appellant based his motion to shift the burden of proof with respect to counts 2, 4 and 5 on the ground that they find no support in the earlier filed Sherman applications and as to counts 1 and 3 on the ground that the involved application cannot be considered a bona fide continuation-in-part of the prior Sherman application, Serial No. 279,341, filed June 15, 1939.

In disposing of appellant's contention that the counts are unpatentable to appellees because anticipated by the patent to Metzner, the Primary Examiner included his ruling on the motion to shift the burden of proof. In so doing he set out the history of the involved application, pointing out that the application for the earliest Sherman patent was filed December 18, 1936, and was considered to claim two separate inventions, one to a combination of printing, feeding and cutting, and the other to the combination of feeding and cutting. On requirement for division the applicant elected to prosecute the combination of printing, cutting and feeding and the application with claims to that subject matter was allowed December 16, 1938. The final fee was paid on June 16, 1939, before forfeiture occurred. On June 15, 1939, Sherman filed his said divisional application confining the claims thereof to the combination of feeding and cutting. While the divisional case was being prosecuted, the involved application, Serial No. 350,545,

was filed on August 3, 1940, as a continuation-in-part of the divisional case which was not allowed until January 13, 1941.

The Primary Examiner stated that the divisional case contained no matter not found in the parent application and that the distinction between the divisional case and the involved continuation-in-part application is that in both the divisional and parent cases the cutter discs are positively driven by gearing means, while in the instant case the cutter is driven merely by contact with another means. He stated that in both the divisional and parent cases distinct reference is made to the cutting by contact and, therefore, that appellees are entitled in the present controversy to the benefit of any matter found therein.

With respect to the contention of appellant in his motion to dissolve on the ground that original counts 1 and 3 are unpatentable to appellees as being covered by claim 4 of the Sherman patent, No. 2,252,734, the Primary Examiner noted that the claim calls for "* * * a rotary pin, aligning and registering feed, *means* in cooperation therewith for lessening the width of the strip ...... and *power means* common to both." (Italics quoted.) He then pointed out that count 1 calls "* * * for separating the feed band portion of the record strip from the record receiving portion thereof." Among other things, he stated that the patent claim calls for "power means" which does not appear in count 1 and held that it cannot properly be contended that the patent claim is for the same invention as that covered by the count.

The examiner held count 3 to be broader than count 1 and also to be lacking in the limitation as to the use of power means found in the patent claim and, therefore, found that count 3 was directed to a different subject matter of invention than that of the patent.

The Primary Examiner then discussed the motion to dissolve with respect to count 5 as not being substantially for the same invention as appellant's claim 11 and held that the only distinction between that count and claim 11 is that there appears in the latter a limitation of "* * * a cylindrical separating surface", while in the count the word "cylindrical" is omitted. He held

that the word "cylindrical" is an immaterial limitation and that since the real invention of both parties is the same, such limitation may be disregarded under the doctrine announced in Bonine v. Bliss, 1919 C.D. 75, affirmed 49 App.D.C. 93, 259 F. 989.

In his decision on the motion to shift with respect to count 2 the Primary Examiner held the contention of appellant that the parent or divisional cases of Sherman do not support the limitation of a " * * * separator element ...... having a dull blunt separating edge" to be without foundation because in the parent case a blade is disclosed which may be " * * * a blunt blade adapted to break the strip on a previously scored or weakened divisional line." That same language, he said, is also found in the continuation-in-part application and since the objection of appellant to count 4 was based on similar grounds, it was open to the same answer.

As has been stated, appellant in his motion to shift alleged that the involved application was not a bona fide continuation of the earlier case and, therefore, that appellees are not entitled to the earlier date. This contention, according to the Primary Examiner, was to the effect that the Sherman patent, Serial No. 279,341, which was allowed on January 13, 1941, was not subject to renewal. In support of his contention appellant cited two decisions, namely, A v. B, 51 U.S.P.Q. 81, and In re Application Filed July 10, 1940, 526 O.G. 857. The Primary Examiner stated those decisions were to the effect that the right of renewal having been abolished, a continuation-in-part cannot be filed to accomplish substantially the same result. The examiner noted that the Sherman divisional case, Serial No. 279,341, had been allowed prior to the time when the right of renewal had been abolished so that, since the continuation-in-part application was filed about four and one-half months prior to the allowance of the divisional case, the motion to shift in this respect was without merit.

The patent of appellant discloses a manifold record strip, the longitudinal side thereof being known as a feed band through which are perforations cooperating with feeding pinwheels. Between the receiving portion and feed band of the strip is a longitudinal severance line made by small closely-spaced perforations. One of the figures of the patent discloses a method of severing the feed band from the record receiving portion of the strip by means of a cylindrical separator needle. As the paper or strip is fed through the mechanism it is propelled over the lower portion of the separator needle along the weakened severance line and thus the strip is broken and the feed band separated from the record portion.

The involved application of appellees discloses a strip feeding and printing assembly. The movement of the paper strip to be severed is in general similar to that shown in appellant's patent. The means of severing the feed band from the record portion of the strip comprises a rotary cutter disc and in one of the modifications of the device the disc projects into a groove and the severance is made along a pre-weakened line in the strip. It is stated in the application that the edge of the disc need not be sharp so as to cut the paper, but that it will break the strip on a preformed weakened division line by pressure.

The Board of Interference Examiners stated in its decision that the Primary Examiner had reached the right conclusion in denying appellant's motions and further held, after a careful review of the record, that appellant had not established a reduction to practice of the invention prior to December 18, 1936, appellees' filing date, and accordingly awarded priority of invention to appellees.

In reviewing appellant's motion for dissolution with respect to the contention that certain counts are unpatentable to appellees as being anticipated by the patent to Metzner, as aforesaid, the board stated that such matter is not ancillary to priority and cannot, as a matter of right, be urged at final hearing. In support of this holding, the board cited Smith and Larsen v. Hill, 177 O.G. 523, 1912 C.D. 97; Erben v. Yardley, 50 App.D.C. 43, 267 F. 345; Gowen v. Hendry and King, 37 F.2d 426, 17 C.C.P.A., Patents, 789. The board also held that the question of patentability could furnish no ground for awarding priority to appellant, citing McDaniel et al. v. Stoehrer et al.,

315 O.G. 612, 1923 C.D. 61; Gowen v. Hendry and King, supra; Dorer v. Moody, 48 F.2d 388, 18 C.C.P.A., Patents, 1188.

With respect to the variation between count 5 and the corresponding claim 11 of appellant's patent by the omission of the word "cylindrical" in the expression "* * * a cylindrical separating surface", the board held that the omitted word was not a material structural limitation. In this connection the board quoted a portion of appellant's patent specification as follows:

"Since the separator needle 47, is cylindrical in shape, the edge thereof functioning in the separating operation is a cylindrical surface and may thus be regarded as being relatively blunt or dull, in comparison with the cutting edge of a knife. It has been found that the relatively blunt, smooth edge presented by the needle 47 efficiently separates the feed bands 11 from the record receiving bands 12 along the severence lines 10, and leaves the edges resulting from the separation relatively smooth and free from objectionable tearing, jamming or cutting out of line, or other mutilation.

"It might be considered possible that a knife could be substituted for the needle 47, but experience indicates that the results obtained by such a substitute are unusually undependable and unsatisfactory because of the tendency of the knife to cut into the bands on either side of the severance line, thereby losing the benefit of the weakened severance line and imposing so much resistance on the advancing strip as to jam, tear, tangle, or otherwise mutilate or objectionably operate on the bands of the record strip. Furthermore, the needle is relatively inexpensive and requires no sharpening to render it serviceable or to maintain it in satisfactory operation."

In commenting on that quotation the board observed that the separating surface of the cutting means is distinguished from a knife-like edge and may be regarded as being relatively blunt or dull and that such relatively blunt surface presented by the needle efficiently separates the feed bands from the record portion. The board further observed that the second paragraph of the quotation contains a criticism of a knife as a substitute for the dull edge and points out the advantage of the latter over the former.

It appears clear to us, as it did to the board, that the expression "separating surface" must have a width of some extent to distinguish it from a knife-like edge. Because the relatively blunt surface, in order to sever the feed band from the strip, is directed along a weakened severance line, it must possess a convex character with respect to the severance line. There can be no question that such a surface in the severing means characteristic of the severance needle of appellant and the dull edge of the severing disc of the involved application both have desired advantages over a knife edge.

We are of opinion, as was the board, that the truly cylindrical needle of appellant does not contribute materially to the invention as defined by his claim 11.

The severing needle of appellant's device, of course, is different in form from the severing disc of appellees, but that part of appellees' blunt, bulged-out disc edge, when engaging the paper, must of necessity be a very short arc, and the dull convexity of appellees' severing means, in our opinion, approximates the cylindrical character of appellant's needle. The very small amount of the surface of the disc as it severs the strip, we believe, does not denote a material difference between its operation and the cylinder of appellant. We are in agreement, therefore, with the holding of the board that the term "cylindrical" is an immaterial limitation and was properly omitted when the interference was declared.

In view of what has already been set forth herein, we deem it unnecessary to unduly lengthen this opinion by further discussion concerning the motions made by appellant.

Nothing herein is to be considered as holding contrary in principle to our decisions in such cases as Field v. Stow, 49 F. 2d 1072, 18 C.C.P.A., Patents, 1502, Atherton v. Payne, 54 F.2d 821, 19 C.C.P.A., Patents, 867.

It appears that appellant is employed by a research and service corporation which conducts research for other interrelated companies, including the Gilman Fanfold

Corporation, appellant's assignee. The American Sales Book Company is one of the corporations for which appellant's employer does research work.

Late in 1936 the American Sales Book Company was a bidder for a contract to supply continuous stationery for record purposes printed on the business machines of the Social Security Board. Not being the lowest bidder that company was not awarded the contract. In an attempt to change the award in its favor the division manager of the company sent for appellant to see if he could do something to secure the business for it. He came to Baltimore, remaining there from Saturday, December 5, 1936, until and including the following Monday. After he had "wrestled with" the situation, appellant was of opinion that the removal of the feed band while the record strip was moving through the machine might be of advantage in securing the contract. It appears that he obtained a piece of wire, which he wished to demonstrate as a severing means, from a fruit basket and fastened it to one of the rods of a "Formaliner" along the side of the guide which contains the pin wheels. A Formaliner is an aligning device attachable to business writing machines. The paper was then fed against the wire through the Formaliner by hand operation. Evidently the demonstration was a failure. Then a paper clip was used instead of the wire and found to be "more successful." The feed band apparently was detached from the record portion of the strip by such hand operation.

The evidence shows that one demonstration was made on Saturday and another on the following Monday at Baltimore in the office of the Social Security Board in the presence of several witnesses who testified on behalf of appellant. One of appellant's witnesses, connected with the selling department of the American Sales Book Company, after having seen the demonstration, sent a letter to the sales manager of the company in which the following appears: "I want to take this opportunity to tell you that the demonstration Mr. Mabon put on for the Social Security Board in Baltimore last Saturday afternoon and again on Monday, was 100 per cent perfect, and the little hairpin attachment he improvised for tear-ing off marginal punching while the sheets were going through the machine, strengthened our position very materially and is going to be a great factor in offsetting the price variance of our forms over Bonner Vawter's forms. Mr. Mabon certainly is deserving of great credit for the work he has done in this instance."

Appellant's witnesses to the demonstrations testified entirely from memory, but stated generally that the paper was severed. Appellant did not test his device with the Formaliner attached to the tabulating machine with which it was to be used and by which it was to be motivated.

During the taking of testimony appellant repeated what he had done in Baltimore. Due to what he stated to be inaccurate spacing or size of the holes in the feed band, the demonstration in Washington was not successful, but seemingly those defects were not present at Niagara Falls, where a further demonstration was made by appellant.

Appellant testified that his tests were successful even though it was necessary to make changes such as a further weakening of the line of separation on the record strip.

It appears to us, without discussing in detail the testimony for appellant, that he has not sustained his burden of proof. When he made the demonstration in the office of the Social Security Board it was clearly for the purpose of influencing the Government officials to favor the bid of the American Sales Book Company in making a re-award of the contract at a higher price than that which had been submitted by the successful bidder. Those demonstrations cannot be considered as showing to the witnesses thereof a practical machine for the severing of feed bands. The record shows that it was part of appellant's business to demonstrate Formaliners to prospective customers and it must be remembered that the paper clip slitter was not actually used on a tabulating machine or any other writing machine, but was merely attached to the bar of a Formaliner off the machine and operated by hand. It would seem that the Baltimore demonstrations were made in order that the Government officials would be impressed with what

could be developed in the future and, of course, for the purpose of influencing action on the bidding. The testimony of one of appellant's disinterested corroborating witnesses is not clear in distinguishing what actually was done in the Baltimore demonstrations from what a perfected device would do. Two of his other witnesses were salesmen of the American Sales Book Company and between the time of the Baltimore demonstrations in 1936 and the time their testimony was given they must have seen many successful operations of appellant's perfected device. They testified entirely from memory. Those witnesses evidently did not know any of the difficulties testified to by appellant. He made mention of the fact that in operating the Formaliner with the paper clip attached it was necessary to use his thumb to hold the body of the paper down and that also he had to overcome the difficulty of the paper winding around until it jammed the machine. None of the paper clips or early type slitters of appellant were preserved and, as the board pointed out, the early type which was used in appellant's demonstrations is not included in any of the modifications shown in the patent.

Answering appellant's contention that the device is of such a simple make-up as to come within the rule laid down by such decisions as Loomis v. Hauser, 19 App.D.C. 401, 99 O.G. 1172, 1902 C.D. 520, the board observed that the counts were drawn not merely to a slitter per se but to a combination of elements which includes means for feeding the paper, citing Euth v. Oliver, 70 F.2d 110, 21 C.C.P.A., Patents, 1027.

The board held that it was not necessary to test the device on a power driven tabulation machine, but in this connection stated that the operator's hand cannot replace a missing element or requirement, citing Wilcox v. Danner, 53 F.2d 711, 19 C.C.P.A., Patents, 802.

Appellant produced no bands or sheets of paper that had been separated by the device in the early demonstrations. While it is true that the bands and sheets may have been severed, the condition of the resulting parts might be of such a ragged or torn character as to indicate that the device at that time could not be operated in a satisfactory manner.

One of the witnesses for appellant was asked if he had any record showing what he believed was the first slitting device he had made and answered, "Well, we got one here, but we played with it before this, back on October 5th, 1937. We added a slitter and a stripper to F C 26, pointed pins, aluminum web tractor, and a Formaliner adjusting bracket. It was supposed to have been sent to Crosby Wirth."

Prior to that time the witness seemingly had made only experimental devices.

While the witness stated he was familiar with a device known as a "hairpin slitter", he had made no drawing, nor preserved any record of it. He stated, "We kept on experimenting with it and made several types of slitters that could be screwed to the present Formaliner, fastened to a shaft or the top."

The witness had been in charge of the shop where the Formaliners were made and the shop was known as appellant's supplier. It was equipped with the necessary means for making various mechanical devices, among which were Formaliners. He had made around 7,500 Formaliners from 1935 until about 1942, when he shipped all of the dies, tools and fixtures to Kidder Press Company of Dover, New Hampshire. The witness testified that he had made the original Formaliner and had been requested by appellant to apply a slitter (appellant's needle) to a Formaliner.

In answer to a question as to how the "hairpin slitter" was constructed, he stated: "A. Well, it was a piece of paper clip, Mr. Mabon came to our plant and we took a paper clip and wound it around one of the shafts on the Formaliner. Operating the Formaliner by hand we proceeded to see what we could actuate by stripping an edge off of the paper."

He further testified that it worked to a certain degree, but that "We were not satisfied with it." In addition, he stated, "We kept on experimenting with it 'and made several types of slitters that could be screwed to the present Formaliners, fastened to a shaft or the top." In answer to the question, "You were satisfied it was

a workable device?", he answered, "No, we were never satisfied."

It seems to us, as it did to the Board, such answer meant that neither the witness nor the appellant were satisfied with the paper clip combination as a workable device. Appellant testified that when he left Baltimore he contacted his superiors in Niagara Falls and told them of the demonstrations which he made in Baltimore. He stated that he had exhibited to them the paper clip and removable stub and requested authorization to build a device comprising his idea so that it could be demonstrated to officials of his company. After he had reported to his superiors, appellant went to the place of business of the witness who testified, "No, we were never satisfied." and at appellant's request, a wire was tightened around the center tie rod of a Formaliner. Then as appellant testified, the apparatus was taken to the American Sales Book Company, placed on their machines and the forms run through, showing how the feed band could be removed. He stated that he as well as three other persons connected with his company were present when the demonstrations were made. If the witness who made the Formaliners had not meant that both appellant and himself were not satisfied the paper clip severance means on the Formaliner was a workable device, it seems to us it would have been a very simple matter to have called as witnesses the three persons whom appellant stated were present when the tests were made on the premises of the American Sales Book Company, as aforesaid, and who seemingly were available, or at least to have straightened out the witness as to his exact meaning.

It is clear from the record that appellant can be given no date of conception prior to December 5, 1936, and we are of opinion that the evidence on his behalf does not clearly establish an actual reduction to practice prior to appellees' filing date—December 18, 1936. The board properly, therefore, awarded priority of invention of the subject matter of the involved counts to appellees.

We are convinced that it has been established by the evidence that the invention is that of Sherman and it is not necessary to discuss the suggestion by appellant that he was not the true inventor. In any event, in a proceeding such as this, the rights of Sherman cannot be defeated by showing contributions by strangers. Foster v. Antisdel, 14 App. D.C. 552, 88 O.G. 1527, 1899 C.D. 413; Borglin v. Palmer, 70 F.2d 899, 21 C.C.P.A., Patents, 1109.

The board noted that the oath to the earliest Sherman application is dated December 3, 1936, and the application was filed on December 18, 1936. That gives a date of conception to Sherman antedating the earliest date of appellant—December 5, 1936. The board stated that such facts would appear to be similar to those in the case of Petty v. Giles, 125 F.2d 177, 29 C. C.P.A., Patents, 804. In that case diligence was not questioned and we do not deem it necessary, in view of what has already been said, to consider the application of that case to the present state of facts.

The decision of the Board of Interference Examiners is affirmed.

Affirmed.