40 C.C.P.A.(Patents)

### Application of KEBRICH.
### No. 5922.

United States Court of Customs and Patent Appeals.

Feb. 6, 1953.

Harold T. Stowell, Washington, D. C. (John O. Evans, Jr., Washington, D. C., of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting the four product claims in appellant's application for patent reading:

"12. A new chemical compound corresponding to the general formula $2PbO.Pb(C_nH_{2n} + 1\ COO)_2$ where 'n' represents a number of carbon atoms at least 5 and up to 29.

"13. A new chemical compound, dibasic lead stearate, corresponding to the formula $2PbO.Pb(C_{17}H_{35}COO)_2$."

(It is our understanding that the formula in claim 13 has the same meaning to those skilled in the chemical art as $PbSt_2 2PbO$, which is hereinafter referred to with explanation.)

"14. A new chemical compound, dibasic lead caproate, corresponding to the formula $2PbO.Pb(C_5H_{11}COO)_2$.

"15. A new chemical compound, dibasic lead laurate, corresponding to the formula $2PbO.Pb(C_{11}H_{23}COO)_2$."

Five claims covering the method of manufacturing the product were held allowable by the Primary Examiner.

The following respecting the invention is taken from the brief before us on behalf of appellant:

"The invention is based upon appellant's discovery that in the presence of relatively small amounts of aliphatic alcohols and ethers, such as isobutanol and the monobutyl ethers of ethylene glycol and diethylene glycol, lead monoxide (PbO) readily combines with long chain fatty acids containing from six to thirty carbon atoms to produce well defined lead salts of the fatty acids of good color and containing a minimum of watersoluble salts and other impurities.

"Of particular interest is appellant's discovery that by the use of his new method it is possible to produce basic lead salts of the higher fatty acids of a type not heretofore available. * * *."

The following is from the decision of the board:

"The appealed claims relate to assertedly novel chemical compounds. Claim 12 is addressed to a class of lead salts of saturated fatty acids having from 6 to 30 carbon atoms. The lead salts claimed are dibasic lead soaps containing a greater amount of lead than is found in the normal or neutral soap. Claim 13 is addressed to the stearate; claim 14 to the caproate, and claim 15 to the laurate. It appears to be conceded that normal lead soaps of different classes of acids are well known in the art but it is asserted that the dibasic compounds of the appealed claims are novel."

In rejecting the product claims the Primary Examiner cited two scientific articles as references.

The principal article was one by Balfe and Chatfield, which appeared in the *Journal of the Society of Chemical Industry* in February, 1940, relating to "The interaction of Litharge with Carboxylic Esters." This reference is hereinafter referred to as Balfe et al.

The other is stated in the record as "Pages 197 to 199 Inclusive, 204 and 205 of Elliott's 'The Alkaline-Earth and Heavy-Metal Soaps' Reinhold (1946)." This reference is hereinafter referred to as Elliott.

The brief for appellant declares:

"* * * These new salts are formed by the reaction of lead monoxide and fatty acid in the proportion of three mols of PbO to two mols of fatty acid. They have the general formula $2PbO.Pb(C_nH_{2n+1}COO)_2$.
wherein n is an integer from 5 to 29."

It will be observed that the foregoing formula is the one stated in claim 12, supra.

It was further said in the brief for appellant:

"Typical of the new basic lead salts of the invention is dibasic lead stearate, $2PbO.Pb(C_{17}H_{35}COO)_2$."

That is the formula given in appeal claim 13, supra, which, as hereinbefore stated, has the same meaning as $PbSt_2 2PbO$, a formula specified in the Balfe et al. reference.

It is pointed out in the brief of the Solicitor for the Patent Office that claim 13 is directed to a species of the broader subject matter claimed in claim 12, and the brief states, we think correctly, "* * * it is obvious that if claim 13 is met by the prior art, claim 12 is likewise met."

We think also that, as stated in substance in the Solicitor's brief, it is evident from a mere inspection of claim 13 that appellant claims invention in a chemical compound, dibasic lead stearate, corresponding to the formula recited in the claim.

A pertinent definition of "dibasic" as used in chemistry, according to Webster's New International Dictionary, is "containing two equivalents of a base."

In the Balfe et al. article, cited as the principal reference, many experiments conducted by them with different material are recited. One, designated "Expt. (j). Ethyl Stearate.—" reads in part as follows:

"The lead salts were dissolved in chloroform which contained 5% of methyl alcohol, and the filtered solution was allowed to evaporate at room temperature. The lead salts which separated were recrystallised seven times in the same way. The lead contents and colours of the solids were: after two recrystallisations, 46.4%, light brown; four, 45.4%, light brown; five, 43.6%, buff; seven, 37.6%, white ($PbSt_2$ requires 26.8% Pb; $PbSt_2$, PbO,

41.6%; PbSt₂,2PbO, 50.9%; PbSt₂,-3PbO, 57.4%).

"25g. of the original crude lead compounds were dissolved in chloroform and precipitated by acetone. The precipitate was extracted with hot ethyl alcohol and then with hot chloroform.

"The portion soluble in ethyl alcohol (10.1 g.)contained 30.4% Pb (27.0% after crystallisation) and consisted of lead stearate. The chloroform-soluble portion (5.4 g.) contained 47.5% Pb and was a mixture of $PbSt_2,PbO$ and $PbSt_2, 2PbO$. The insoluble residue (6.5 g.; 56.9% Pb) consisted of $PbSt_2,-3PbO$."

It has been explained hereinbefore that the formula $PbSt_22PbO$ means to those familiar with chemical formulae the same substance as that defined in claim 13 by the formula $2PbO.Pb(C_{17}H_{35}COO)_2$.

The brief of the Solicitor for the Patent Office states:

"* * * 'PbSt₂' of the reference is but a shorthand expression for the stearate moiety of the appealed claim, for 'St' in the reference description stands for stearate. Any chemist having knowledge of structural and empirical formulae would conclude without question that the compound designated as 'PbSt₂,2PbO' is dibasic lead stearate."

The correctness of the assertion so made in the brief of the solicitor, which of course was prepared by an expert in chemistry, is not challenged by counsel for appellant, but counsel does not concede that the presence of the formula in the reference constitutes sufficient disclosure.

It is the position of counsel for appellant that the cited references do not *clearly* disclose dibasic lead stearate as a new chemical compound. The brief on behalf of appellant discusses the Balfe et al. "experiment (j)" hereinbefore referred to, its discussion of the paragraph containing the formula relied upon by the tribunals of the Patent Office being as follows:

"* * * the article states that 25 grams of the original lead compounds were dissolved in chloroform and precipitated by acetone. The precipitate was extracted with hot ethyl alcohol and then with hot chloroform. The ethyl alcohol solution portion was found to contain 30.4% Pb and was assumed to be normal lead stearate. The chloroform soluble portion was found to contain 47.5% Pb and it is stated was a mixture of dibasic lead stearate and monobasic lead stearate. It should be noted, however, that at this point, no other indication of the character of the compound formed is shown except the lead content and it is apparent that the conclusion that this compound was a mixture of dibasic and monobasic stearate is based entirely on the fact that the lead content falls between the theoretical lead contents of these two compounds. On this basis, the mixture produced by Balfe et al. could just as logically be a mixture of tribasic and normal lead stearate. An insoluble residue is also reported as containing 56.9% Pb to which is ascribed the formula of tribasic lead stearate. The nearest that Balfe et al. ever comes to disclosing the dibasic lead stearate compound is found in his reference to a mixture allegedly of monobasic and dibasic stearate."

"There is no unequivocal statement that dibasic lead stearate was produced, and in view of the fact that only a mixture of intermediate composition was obtained it is obviously questionable on the face of the article whether the dibasic lead stearate described and claimed by appellant was obtained by the authors of the article. Standing by itself the article is at most conjectural and not an anticipation of appellant's invention."

The brief then asserts:

"But the fact is that dibasic lead stearate is not produced by the method described. This is definitely and convincingly established by the detailed experiments set forth in the affidavits of record. These affidavits clearly show that whatever the mixture of intermediate composition obtained by

Balfe et al. contained it did not contain the dibasic lead stearate of appellant's invention."

■ As has been indicated, the statement in the brief of the Solicitor for the Patent Office to the effect that the formula in claim 13 is identical in meaning with the formula named in the Balfe et al. "experiment (j)" is not challenged by counsel for appellant, nor is it questioned that such identity of meaning is familiar to those skilled in the chemical art. No formula or element in the other experiments is more prominently mentioned nor more emphasized than that one. We think, therefore, that disclosure sufficient to meet the requirements of the statute, 35 U.S.C. § 102 (1952) (formerly R.S. 4886, 35 U.S.C. § 31), must be held to have been established.

We have not overlooked the statement in the description given by Balfe et al. of their experiment (j) to the effect that the chloroform-soluble portion of the compound used was a *mixture* of dibasic lead stearate and monobasic lead stearate and the argument on behalf of appellant predicated upon that fact has been duly considered. The case of In re Williams, 171 F.2d 319, 36 C.C.P.A., Patents, 756, in which we said in effect that the existence of a compound as an ingredient of another substance does not negative novelty in a claim to a pure compound, is claimed to support the contention that there was not a clear disclosure of dibasic lead stearate.

There is, we think, a clear distinction of fact between the Williams case and the instant case, in that in the former case there was a definite limitation as to the chemical compound of the claim there involved, which excluded the pertinency as a reference of a *mixed* compound of the type there cited—a situation not present in the instant case.

Speaking particularly of claim 13, supra, the brief of the Solicitor for the Patent Office points out that:

"* * * It does not call for a dibasic lead stearate of any particular degree of purity. It defines only the chemical compound regardless of purity or form or manner in which it is pro-

duced or marketed. It covers broadly the pure compound, and mixtures of such compound with other materials; it also covers the dry salts, solutions thereof, and compositions containing the same. While appellant's argument conveys the suggestion that the claim is limited to the pure compound, and appellant's specification states that an object of the invention is the manufacture of purer and more commercially valuable products, it should be noted that there is disclosed also the fact that mixtures of the basic lead salts may be formed by varying the ratio of lead oxide used in the process, and by using mixed acids."

■ Whatever may be the practice of the courts in the interpretation of claims in infringement proceedings in order to sustain patents once granted, it is very definitely settled by a line of consistent decisions rendered during a long period of time that in the initial consideration of the question of patentability neither the tribunals of the Patent Office nor the courts in reviewing their action may properly read unexpressed limitations into claims, and it is equally as well settled that, so limited, the tribunals and the reviewing courts in the initial consideration of patentability will give claims the broadest interpretation which, within reason, may be applied.

We have hereinbefore quoted from the brief on behalf of appellant, the allegation that dibasic lead stearate is not produced by the method described in the Balfe et al. article. The allegation so made is based upon the affidavits of two gentlemen whose qualifications as research chemists seem to be well established by the affidavits, who testified that they made tests of the experiment (j) recited in the Balfe et al. article, and who declared in effect that the process so defined was found to be inoperative—that is, that it failed to produce dibasic lead stearate.

In the brief of the Solicitor for the Patent Office the affidavit is analyzed with much more care than it was by either the Primary Examiner or the Board of Appeals, and specific instances of failure on

the part of affiants to follow the process which Balfe et al. recited are pointed out. The instances would seem to be quite important, but their detailed recital here is deemed unnecessary because of the well settled rule of law respecting inoperativeness where pertinent formulae are disclosed in the prior art.

In the case of In re Crosley, 159 F.2d 735–736, 34 C.C.P.A., Patents, 882, 884–885, we said:

"Furthermore, this court is committed to the doctrine that where a product is clearly disclosed in a publication, the operativeness of any of the processes by which it is claimed the product could be produced is immaterial, and that the disclosure of the composition is sufficient to anticipate a claim therefor. In re Marden, 48 F.2d 428, 18 C.C.P.A., Patents, 1119 and cases therein cited; In re Von Bramer et al., 127 F.2d 149, 29 C.C.P.A., Patents, 1018, 1024."

There has been no serious contention before us that claims 12, 14, and 15 are allowable if the decision of the board as to claim 13 be upheld, and it is unnecessary, therefore, to analyze and discuss those claims.

The decision of the Board of Appeals is affirmed.

Affirmed.