Kenyon & Kenyon, Ralph L. Chappell, New York City, for appellants.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for Comr. of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

**Application of Frank Peter DOYLE, John Herbert Charles Nayler and George Newbolt Rolinson.**

**Patent Appeal No. 7098.**

United States Court of Customs and Patent Appeals.

Feb. 13, 1964.

MARTIN, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 2 and 4, the only remaining claims in appellants' application serial No. 833,680, filed August 14, 1959 for SUBSTANCES PRODUCED FROM PENICILLIN-PRODUCING MOULDS.

2. 6–Aminopenicillanic [1] acid having the structural formula:

which is capable of reacting with phenylacetyl chloride to produce benzylpenicillin, and which gives a negative Bratten-Marshall test and a negative ninhydrin test.

4. Solid, nonhygroscopic 6–aminopenicillanic acid having the structural formula

and melting at about 209–210° C.

---

1. Hereafter referred to in the opinion as 6–APA.

The application discloses that 6–APA is used in preparing antibiotic substances.

The references relied on by the examiner and the board are:

Kuhne—Pharmazie, Vol. I, pages 200–201 (1946)

Sakaguchi et al.—J.Agri.Chem.Soc. (Japan), Vol. 23, page 411 (1950)

Arnstein et al.—Biochem J., Vol. 67, pages 180–187 (1957)

Hockenhull et al.—Arch.Biochem., Vol. 23, pages 160–161 [2] (1949)

The Kuhne article discloses that a more complete investigation of the material known as penicillin A has revealed that it is not a simple substance but consists of several different penicillins, all of which have a common skeleton and differ only by a side chain always located in the same position. Penicillin G, one of such penicillins, is depicted as having the following structural formula:

Skeleton                    Side chain

Kuhne indicates that although the skeleton portion of penicillin G had not been named it has been proposed to "include the keto-C atom in the side chain, and to refer to the linkage of this C-atom to the nitrogen as a peptide linkage, so that the skeleton would be that of an amine of the following structure:

The Sakaguchi et al. publication discloses a new enzyme, penicillin-amidase, which splits penicillin G. The authors indicate that from the reaction mixture of penicillin G and penicillin-amidase, "phenyl acetic acid and a substance which we presume 'penicin' have been isolated, the latter substance being in the form of hygroscopic crystalline needles giving m. p. 158–159°C. This substance, which itself does not give ninhydrin reaction,[3] develops an intense blue violet coloration

2. The board considered the Hockenhull et al. publication as being merely cumulative and did not discuss its disclosure or apply it to the claims. We find nothing in that publication calling for specific consideration here and thus agree with the board's treatment.

3. NOLLER, CHEMISTRY OF ORGANIC COMPOUNDS 293 (1952) discloses that in the ninhydrin reaction, $\alpha$-amino acids, and proteins or their degradation products that contains a free carboxyl group having an $\alpha$-amino group, yield a blue color when heated in dilute solution with triketohydrindene hydrate (ninhydrin).

by ninhydrin reagent after it was acted with [upon by] penicillinase." "Penicin" is depicted as having the formula:

$$CH_3-C(CH_3)-\underset{S}{|}-\overset{H}{\underset{N}{C}}-COOH$$

*(structural formula of "penicin")*

Arnstein et al. disclose suggested pathways of penicillin biosynthesis. Set forth as a possible reaction mechanism is a process which starts with cysteinylvaline, the final step in the penicillin biosynthesis being postulated as consisting of the acylation of a compound having the structural formula:

$$H_2N\cdot CH-CH \quad S \quad C(CH_3)_2$$
$$CO-N \underline{\qquad} CH\cdot CO_2H$$

*(structural formula)*

The examiner rejected claims 2 and 4 as "lacking invention" over Kuhne or Sakaguchi et al. or Arnstein et al., all of which were considered to "teach the *concept* of 6–aminopenicillanic acid which is the compound that is instantly being claimed." The examiner stated that the presence of 6–APA could be readily appreciated by one skilled in the art in view of the cited references. The patentability of isolating 6–APA from the fermentation liquor obtained in the biosynthesis of penicillins was said by the examiner to have been recognized by the Patent Office since appellants' parent application, serial No. 750,057, of the instant application serial No. 833,680 [4] has matured into US patent No. 2,941,995 and the claims of the parent application "are directed to a *method of recovering* the 6–aminopenicillanic acid from an aqueous solution."

In affirming the examiner's rejection the board stated:

"In each of these publications [Sakaguchi et al., Kuhne and Arnstein et al.] the compound claimed was described by its structural formula which is the means most commonly used by chemists to accurately describe an organic chemical. From the publications a chemist would be informed of, and understand the exact nature of the claimed compound and its relationship to valuable compounds of the prior art."

Appellants contend that they have produced a compound which was not available before and have made possible "new penicillins both for commercial exploitation and for extensive research work." They urge that they were the first to produce, isolate and purify solid 6–APA and to determine its properties. It is argued that the prior art had depicted the structural formula of 6–APA, not to describe an alleged existing compound, but rather as a possible merely theoretical intermediate which might exist along a suggested pathway of reaction in penicillin biosynthesis; as a non-existent, purely theoretical skeleton to form the basis for a new system of penicillin nomenclature; and as a "presumed" structural formula for a material isolated from the reaction mass after enzymatic action on penicillin, but not having the physical properties of 6–APA.

We think the issue facing this court is whether the compound as recited in the appealed claims is described in, or obvious from, the cited art. To determine that question, a careful analysis of appellants' application is necessary.

According to the application, appellants have found that substances having antibiotic activity can be obtained by reacting, with a suitable chemical reagent, the

4. Serial No. 833,680 is stated by appellants to be a division of serial No. 750,057.

fermentation liquor obtained by growing a penicillin-producing mould, such as penicillium chrysogenum.

The application discloses that the fermentation liquor contains a compound of the structural formula:

$$H_2N - CH - CH \diagdown S \diagup C \diagup CH_3$$
$$\qquad \diagdown CH_3$$
$$\qquad | \qquad | \qquad | $$
$$\qquad CO - N - CH - COOH$$

which "we term 6–aminopenicillanic acid following the nomenclature adopted by other workers in analogous fields." Appellants state that this 6–APA is a non-hygroscopic compound which in a substantially pure form has a melting point of 209 to 210°C. and gives the following analysis: carbon 44.6%; hydrogen 5.-7%; nitrogen 13.1%; and sulfur 14.1%. Compared with this analysis they point out that $C_8H_{12}O_3N_2S$, the empirical formula of 6–APA, requires: carbon 44.4%; hydrogen 5.6%; nitrogen 13.0% and sulfur 14.8%. The compound 6–APA is stated to give a negative Bratten-Marshall test and a negative ninhydrin test and to be capable of reacting with phenylacetyl chloride to produce benzyl-penicillin.

Appellants state in their application that the procedure to be followed in preparing antibiotic substances from 6–APA depends largely upon the extent to which the 6–APA has itself been purified. Thus, it is said that 6–APA may be used in three different states of purification: (1) isolated 6–APA, (2) 6–APA concentrate and (3) the dilute fermentation brew containing 6–APA. 6–APA concentrate is described as a clarified fermentation liquor which has been subjected to an initial concentration procedure and from which the natural penicillins have been substantially removed by solvent extraction at pH 2 to 3. It is said to usually contain 0.6–1.2 mg./ml. of 6–APA which represents about 1%

of the total solids present. The dilute brew is the original clarified fermentation brew from which natural penicillins have been substantially removed by solvent extraction at a pH of 2 to 3 but which has not been concentrated. The dilute brew is said to be about ten times more dilute than the 6–APA concentrate.

Appellants disclose in the application that when 6–APA is available in relatively pure form it is only necessary to use a small excess of added reagent in preparing the antibiotics and that the products are, in turn, obtained in a fairly pure state. On the other hand, appellants indicate that when the starting material is a 6–APA concentrate, it is necessary to use a much larger excess of reagent and the resulting products, as compared with those obtained when starting with 6–APA in relatively pure form, are "very much less pure." With the dilute brew, as with the 6–APA concentrate, appellants state that a "large excess of reagent" is necessary in preparing the antibiotics.

The examiner has readily conceded that 6–APA "is a valuable intermediate" but considers that from the art of record "its presence could be readily appreciated." We agree with the examiner that this is the case with respect to appellants' claim 2, especially in light of the Sakaguchi et al. reference.

Sakaguchi et al. state they have found in the mycelium of penicillium chrysogenum that the enzyme penicillin-amidase

"splits penicillin G into its components, i. e. phenyl acetic acid and a residual por-tion of penicillin G" which they have as-signed the structural formula:

$$
\begin{array}{c}
CH_3 \\
\phantom{x}\diagdown \\
\phantom{xx}C-C-COOH \\
CH_3 \phantom{xx} H \\
\phantom{xx}| \phantom{xxx} | \\
\phantom{xx}S \phantom{xxx} N \\
\phantom{xxx}\diagdown \phantom{x} \diagup \phantom{x} \diagdown \\
\phantom{xxx}CH \phantom{xx} CO \\
\phantom{xxxx}\diagdown \phantom{x} \diagup \\
\phantom{xxxx}CH \\
\phantom{xxxx}| \\
\phantom{xxx}NH_2
\end{array}
$$

That residual portion does not give a nin-hydrin reaction but is said to develop an intense blue violet coloration by ninhy-drin reagent after it is acted upon by penicillinase. The authors have further postulated, through a reaction mechan-ism, that the splitting of penicillin G in-volves an hydrolysis of penicillin G.

Appellants obtain a compound which they have characterized as having the structural formula:

$$
\begin{array}{c}
S \phantom{xxxxx} CH_3 \\
\diagup \phantom{x} \diagdown \phantom{x} \diagup \\
H_2N-CH-CH \phantom{xx} C \\
\phantom{xxxxx}| \phantom{xxx} | \phantom{xx} \diagdown \\
\phantom{xxxxxxxxxxxxxxx} CH_3 \\
\phantom{xxxx}CO-N-CH-COOH
\end{array}
$$

from a strain of penicillium chrysogen-um. The compound gives a negative nin-hydrin test. In an affidavit of one Sid-ney N. Sadoff, submitted by appellants, it is stated that the enzyme penicillinase destroys 6–APA, and thus contamination of an aqueous solution of 6–APA with bacteria that produce penicillinase ordi-arily leads to the destruction of 6–APA. In exhibits attached to the Sadoff affi-davit it is stated that during a hydrolysis reaction an amidase enzyme hydrolyzes penicillin G to 6–APA and phenylacetic acid.

Thus both Sakaguchi et al. and appel-lants start with a strain of penicillium chrysogenum and both indicate that through a hydrolysis reaction, catalyzed by an amidase enzyme, they obtain the compound, phenyl acetic acid, and a com-pound which does *not* give a ninhydrin reaction and has the structural formula

$$
\begin{array}{c}
S \phantom{xxxxx} CH_3 \\
\diagup \phantom{x} \diagdown \phantom{x} \diagup \\
H_2N-CH-CH \phantom{x} C \\
\phantom{xxxxx}| \phantom{xxx} | \phantom{x} \diagdown \\
\phantom{xxxxxxxxxxxxxx} CH_3 \\
\phantom{xxxx}CO-N-CH-COOH
\end{array}
$$

Furthermore, Sakaguchi et al. indicate, as to appellants, that the latter compound is unstable in the presence of the enzyme penicillinase. Such close correlation from the record convinces us that the 6–APA as defined in claim 2 is disclosed in the Sakaguchi et al. reference. Although the record indicates that 6–APA when in a solid nonhygroscopic form melting at 209 to 210° C. is pure, claim 2 does not specify the melting point of the 6–APA therein claimed nor for that matter, the form in which it occurs. See In re Kebrich, 201 F.2d 951, 954, 40 CCPA 780, 785. Thus, we think that the Sakaguchi et al. reference describes the 6–APA as recited in claim 2.

We are not persuaded, however, that the 6–APA as recited in claim 4 is described in, or obvious from the cited art. That claim recites solid, nonhygroscopic 6–APA melting at about 209–210° C. and the application indicates that 6–APA with those physical characteristics is substantially pure. In none of the art of record do we find even a suggestion of 6–APA in a solid, nonhygroscopic substantially pure form nor a suggestion of obtaining 6–APA as such.

■■ While the mere purification of a known material ordinarily does not result in a patentable product, a pure compound may, under certain conditions, be patentable over the same compound in an impure form. In re Williams, 171 F.2d 319, 36 CCPA 756. We think such conditions prevail here. Appellants have disclosed that use of substantially pure 6–APA in solid nonhygroscopic form results in a greater quantity of pure antibiotic with a lesser quantity of added reagent than is obtainable with impure 6–APA. In fact, the affidavit of record, indicates that when 6–APA with a purity of less than 90% is acylated the amount of an antibiotic of requisite quality obtained is reduced in yield too far for commercial acceptance.

Accordingly for the reasons set forth above the decision of the board is reversed as to claim 4 but affirmed as to claim 2.

Modified.