## PERMUTIT CO. v. VILLAGE OF POYNETTE, WIS.

No. 333.

District Court, W. D. Wisconsin.

June 28, 1945.

Clarence D. Kerr and E. Cummings Sanborn, both of New York City, and Emmert L. Wingert, of Madison, Wis., for plaintiff.

Ira J. Wilson, of Chicago, Ill., Edward A. Morsbach, of Rockford, Ill., Harlan B. Rogers, of Portage, Wis., and W. L. Jackman, of Madison, Wis., for defendant.

STONE, District Judge.

Plaintiff, a Delaware corporation, with its main office in New York City, New York, brought this action against the defendant, Village of Poynette, Wisconsin, alleging infringement of the claims of the four patents in suit: No. 1,954,405 of Dotterweich; No. 1,903,957 of Clark; No. 1,931,968 of Sweeney & Clark; and No. 2,076,321 of Pick. The defendant contends that the claims in suit are invalid and bases that defense on prior art, non-compliance with R.S. § 4888, 35 U.S.C.A. § 33, and that some of the claims are mere functions. It also sets up a defense of non-infringement of said claims.

The Automatic Pump and Softener Corporation of Rockford, Illinois, sold to defendant and installed for it the municipal water softener here charged to infringe the patents in suit, and assumed the defense herein on behalf of the defendant, and is obligated by contract to save defendant harmless against all claims of infringement.

In October 1932 plaintiff's predecessor, General Water Treatment Corporation, purchased the application for the Dotterweich patent, with a number of other relatively unimportant Dotterweich patents, for $325,000. Plaintiff and its predecessor have sold more than eight thousand water softeners made under some of the claims of the Dotterweich patent in suit, although no structure in the form defined in the claims in suit or shown in the drawings of the Dotterweich patent was ever built or sold.

The patents in suit relate to the control mechanism for zeolite water softeners in which hardness is removed from water to soften it, and thus make it useful for household, municipal and industrial purposes. In such softeners, the hard water is passed through a granular insoluble bed, called "zeolite", to remove the hardness elements, calcium and magnesium. After a period of use, the zeolite bed will no longer remove the hardness elements, and must be regenerated to restore the bed to its hardness-removing condition. This regenerating process consists of three steps:

(1) Backwashing; that is, flowing water in reverse direction through the zeolite bed to agitate it and to remove accumulated dirt;

(2) Brining; that is, flowing a brine solution through the zeolite to eliminate therefrom the hardness elements, calcium and magnesium, which have been taken up by the zeolite, and restore it substantially to its original condition;

(3) Rinsing; that is, flowing water through the bed of zeolite to remove excess and spent brine from it. After the regeneration the softener is again ready to perform its function of removing the hardness from the water and to deliver softened water to service.

Prior to January 1924, the date the application for the Dotterweich patent was

filed, most water softeners in use were operated by the manual manipulation of the control valves to direct the flow of water during the regenerating process of backwashing, brining, rinsing and return to softening.

Plaintiff contends that the Dotterweich patent in suit is directed to eliminating the manual operation of the softener, and to making its operation automatic; that it shows a system of valve control which actuates the operating valves in the system through its various cycles in the softening process; that the master control mechanism is operated by an electric motor, through the making and breaking of electric circuits, and when initiated by any means, whether by hand, by time clock, or by the condition of the water, the complete cycle of regenerating is carried out automatically.

Plaintiff contends that the Clark patent in suit discloses a softener in which the time for initiating regeneration is determined by detecting hardness in the treated water flowing to service and causing, by electrical means, the initiation of regeneration of the zeolite bed, in response to a certain degree of hardness in the treated water, the hardness of the water being determined by an automatic soap test, the electrical connections being so arranged that when the treated water fails to give a good soap test, regeneration is initiated, either automatically, by a time clock, or by a hand switch; that no one prior to Clark had utilized in a softener the *principle* of the old manual soap test to put the softener in condition for initiating by electrical means the regeneration process. (In the manual soap test used to detect hardness, the attendant puts a sample of the treated water in a bottle, adds a few drops of soap solution and shakes the bottle. If a lather forms, the water is soft.)

Plaintiff asserts that the Sweeney & Clark patent in suit relates to the regenerating cycle in a zeolite softener, and utilizes the principle of the soap test, disclosed in the Clark patent, *combined* with the action of a photoelectric cell responsive to the amount of light passing through the soap test unit to which treated water flowing from the softener is admitted. When the water from the softener is no longer effectively softened, the reaction of such water with the soap produces a cloudy precipitate in the soap test unit, which cuts down the amount of light passing through the unit to such an extent that an electrical switch is closed, thus conditioning the system for starting the regenerating cycle. Plaintiff alleges that Sweeney and Clark discovered that the opacity or cloudiness developed in water upon the addition of soap solution, if there is hardness present, may be utilized to cut down the illumination of a lamp shining through such cloudy water on a photoelectric cell sufficiently to effect a control over a valve operating motor for controlling the regenerating cycles of a water softener.

Plaintiff also contends that the Pick patent in suit does not pertain specifically to water softeners, but relates to "plural valve actuation and control" and is applicable to fluid flows of various kinds; that it discloses a valve system in which the valves for operating a zeolite water softener are remotely controlled and actuated hydraulically by means of a single multiport pilot valve. In the first position of the pilot valve, the softener valves are actuated for normal service of the softener. In other positions of the pilot valve, the softener valves are operated for reconditioning of the softener. The valves are operated by fluid pressure and are remotely controlled by the rotary multiport valve which, through its intermittent rotation, controls the several fluid valves through the steps of the regenerating process.

It appears from the evidence that on September 16, 1940, shortly after defendant contracted with the Automatic Pump and Softener Corporation for the installation of the water softener in question, plaintiff notified defendant of its alleged infringement of the patents in suit, and defendant sent a copy of such notice to the Automatic Pump and Softener Corporation; that the installation of the defendant's softener was completed in January, 1941, with a manual initiation of the regenerating cycle. Some changes were made in the equipment after the original installation, but no changes were made in the manual initiation of the regenerating cycle. It has been in operation since its installation.

The Poynette softener consists of a zeolite softener tank, with a system of hydraulic and electrical controls over a motor drive used to operate the softener automatically through the successive steps of the regenerating cycle after the softener is once set in motion. It is automatic in every step except that to regenerate

it is necessary, every two or three days, for an attendant to push the button on an electrical connection that starts the initial step in regeneration.

One of plaintiff's contentions is that because regeneration in Poynette cannot be initiated by pressing the button "142", Exhibit D—177B, *unless the warning light circuit has been closed by the hardness tester,* it is that circuit and not the push button which controls or initiates regeneration. The Poynette softener has a safety interlock, absent in Dotterweich, which de-energizes the starting circuit, except when the signal lamp is lighted and regeneration is required, thus preventing accidental or malicious regeneration. In Poynette, regeneration will not be started by closing the warning signal alone—the attendant must also push the starting button. The manual operation of the starting push button, after the closing of the warning signal circuit, may be compared to the starting of an automobile motor by first inserting and turning the key that closes an electric circuit, and then pressing a button or pedal that closes another circuit which starts the motor.

Plaintiff admits that no structures or apparatus in the form shown in the drawing of the Dotterweich patent in suit, or recited in claim 14 of the Clark patent in suit, or embodying the structure described in any of the claims of the Sweeney & Clark patent in suit, have ever been sold by plaintiff or its predecessor in title.

The plaintiff alleges that the Poynette installation infringes the Dotterweich patent because (a) Poynette uses an actuator or driving means which not only operates a pilot valve mechanism to control a series of softener valves, but also operates a switch mechanism which, in turn, terminates the operation of the actuator, when the valves have been set for backwashing, brining and return to softening, respectively; (b) it has an electric control over a motor drive for conducting a sequence of softener operations, which, when initiated, causes the whole series of operations to take place automatically; (c) it provides for initiation of the regenerating cycle by the condition of the water through electrical means; (d) it controls the termination of rinsing by the condition of the water through electrical means.

Plaintiff alleges that the Poynette installation infringes the Clark patent in suit because Poynette in its softening apparatus uses an electrical soap test unit for testing the water discharged from the softener and, if the water is found to be hard in such test, the soap test unit puts an electric circuit in condition to initiate the regenerating cycle in the softener.

Plaintiff contends that the Poynette softener infringes the Sweeney & Clark patent because Poynette's soap test unit is used in conjunction with a photoelectric cell for setting the electric controls of the apparatus (a) in condition to initiate the regeneration cycle when the soap test unit shows that the water discharged from the softener is hard and (b) to terminate the rinsing operation when hardness disappears from the water.

Plaintiff alleges that the Pick patent in suit is infringed by the Poynette unit because Poynette combines with its fluid-pressure actuated diaphragm valves a multiport pilot or control valve so coordinated with the other valves that in one position of the pilot the zeolite softener valves are operated to provide for normal service, while in a plurality of other positions of the pilot the softener valves are operated for various steps in reconditioning or regenerating the softener.

As to the Pick patent in suit, defendant alleges that the claims are invalid because they claim a structure not shown on the drawing or described in the specifications; that they define no invention over prior art, and that the Poynette installation follows prior art instead of Pick, as disclosed in Exhibit D—181.

A reference to Chart D—173 discloses that element 2 of both claims 18 and 19 of the Pick patent in suit defines "a plurality of fluid pressure responsive means for operating each of said valves." Each controlling valve disclosed in the Pick patent is operated by *one* piston or *one* diaphragm which constitutes *one* fluid pressure responsive means for operating a single valve. The Pick claims specify "a plurality of fluid pressure responsive means for operating each of said valves."

The evidence discloses that fluid pressure responsive means for operating valves have been in use since the issuance of the Moore patent in 1889, and long before the Pick patent was granted. A number of other patents, shown on Chart D—166, prior to the Pick patent in suit, disclosed a pilot valve for controlling fluid flow through a plurality of conduits. The Pick valve is of the rotary type, as distinguished

from the reciprocatory type or the oscillating rotary type. The three types are full equivalents, found in the prior art, and the use by Pick of the rotary was not invention. The shape of the pilot valve passages, which give the desired sequence and timing, is a matter of valve design and not invention.

In the Poynette softener, each control valve is closed by fluid pressure acting upon a diaphragm. There is no plurality of diaphragms for operating any valve. The Pick claims, as such, call for a plurality and find no response in Poynette.

The third element of claims 18 and 19 of Pick's patent in suit is not found in Poynette, which has but one pipe connection to each valve, which serves as a pressure supply and as an exhaust. Pick, with the exception of valve 50, discloses pressure responsive pistons, each operating in a cylinder which is connected at both ends by separate pipes to ports of the pilot valve.

Poynette employs a single connection between the pilot valve and each individual valve actuating device. The Pick patent in suit discloses two pipe connections between the pilot valve and the valve operating piston of each valve, except the one diaphragm valve which has a single pipe connection to the pilot valve. One part with one pipe connection is not the "plurality of parts with connections" called for by the Pick claims.

As to element 5 of the Pick claims, the valve which controls the flow of brine in Poynette, numbered 39 on Poynette charts D—177A to D—177F, inclusive, is not operated by any fluid pressure responsive means, as required by the claim. It is operated by an electric motor, and does not infringe the Pick claims.

The Poynette system embodies in its construction and operation the disclosures of prior art and not those of the Pick claims.

The Steinberg patent discloses a plurality of hydraulically actuated control valves operated by fluid pressure conducted through a single pipe from a common rotary pilot valve to one end of each actuator, which are actuated hydraulically in one direction and by springs in the opposite direction, whereas in Pick fluid pressure is admitted alternately to opposite sides of the pistons through the two-pipe connections to move the valve in both directions under hydraulic pressure. Poynette, like Steinberg, has but one pipe connection to each valve actuator, through which pressure is applied from the pilot valve and through which exhaust liquid is returned to the pilot valve. Poynette employs diaphragms of prior art, exemplified by Eisenhauer and Lang, and not pistons for actuating its valves. The valve systems used in Poynette were obtained from prior art and not from Pick.

In the Dotterweich patent, the hard inlet water is continuously bypassed direct to the service throughout the regeneration cycle. This is not present in Poynette, although Poynette has built in a bypass to be used only in case of fire or some other emergency.

The defendant's *pilot stager* is not the mechanical equivalent of the Dotterweich valve actuator. It is a different type of structure and operates in a dissimilar manner to produce a different result. The stager consists of a small pilot disk about the size of a dime, provided with small holes, the size of the lead in an automatic pencil, which must register with holes in a stationary member to control valves; a motor which runs continuously; and a gear clutch mechanism between the motor and the disk arranged so that when one of the gears is pulled out of mesh, the pilot disk stops immediately in the required position of alignment to establish communication with the holes of the stationary member. The claims of the Dotterweich patent in suit do not disclose any equivalent structure. The pilot valves in Dotterweich operate by individual cams on a large momentum-acquiring drum, driven by an intermittently operable motor.

In Poynette the tester in no way controls the regeneration mechanism of the softener, when hardness appears in the water. It simply functions to light the warning signal lamp, and nothing more happens until the attendant pushes the starter button. The electrical conductivity of the water, hard or soft, is utilized in Dotterweich, but is in no way utilized in the lighting of the signal light, or the operating of the Poynette equipment.

Dotterweich has the drum and cam arrangement to control valves. Defendant employs an entirely different valve control mechanism, controlling various valves by rotation of a single pilot disk heretofore described. Dotterweich has the large drum upon which are disposed cams extending circumferentially of the drum. These

cams operate levers, one for each flow-controlling valve of the softener system. The drum is driven by a motor which is started and stopped at the various valve positions.

The Caps patent, issued long before Dotterweich, and now expired, showed an automatic zeolite softener with a meter for measuring the volume of water passing through the softener and a water motor for operating the valves of the softener, when a pre-selected volume of water has passed through the bed. It has two containers for zeolite so arranged that when one is being regenerated, the other is functioning, thus furnishing a continuous supply of soft water to service. Approximately twenty-five softeners identical to that shown in the Caps patent were sold and installed by the Cartwright-Caps Company of Chicago and operated automatically in a fairly satisfactory manner, to which were added improvements so that regeneration was accomplished by a single manual operation in response to a warning signal given by a meter, and by changing the flow of water upward during brining and rinsing.

The Caps patent disclosed all the essential features of the Dotterweich patent, so far as automatic operation, in a broad sense, is concerned. Dotterweich did electrically what Caps had done hydraulically. Caps sold a number of softeners that were successfully operated. The employment of an electrical motor instead of an hydraulic motor for automatically operating a zeolite water softener was not invention.

The Steinmuller patent, issued before Dotterweich, discloses a testing mechanism used in a water treatment apparatus operating on the same principle as Poynette for testing water for hardness, with mechanism for operating a clutch to connect and disconnect a constantly running motor with the shaft. It shows a combined switch and operating mechanism for controlling the water treatment process practically identical with that of Dotterweich, except that a spring motor is used to drive the drum instead of an electric motor.

■ Poynette's pilot stager motor is not controlled by any fluid flowing in the system, but is controlled by the pressure in the storage tank. Its brine valve motor is not controlled by any fluid flowing. The regeneration in Poynette is initiated manually by the hand switch button. The use of the human hand to initiate regeneration in the Poynette apparatus is substantially different from and not the equivalent of the automatic electrical control device used to initiate regeneration in Dotterweich. Brown v. Davis, 116 U.S. 237, 6 S.Ct. 379, 29 L.Ed. 659.

In the Poynette construction, the valves are operated by two entirely separate operating mechanisms having two separate motors and two separate electrical control circuits, and such construction is different than the single direct connected motor system used by Dotterweich.

The Poynette hydraulically operated valves are controlled by a pilot valve which is driven through the beveled gear clutch by a continuously rotating electrical motor. An entirely separate mechanism is employed for driving and controlling the brine valve by separate motor in a separate circuit. The stager motor is pressure controlled. The motor that operates the brine valve is controlled by a change in the brine level in the brine tank. Its system is not the equivalent of or similar in structure and method of operation to the single mechanism controlling all the valves of the Dotterweich claims.

The first seven elements of Claims 13, 14 and 35 of the Dotterweich patent in suit are the ordinary elements of a zeolite water softener in use at the time the Dotterweich application was filed.

■ All of the claims of the Dotterweich patent in suit are invalid for the reason that they define no invention over the prior art. Dotterweich applied mechanical skill to that which was plainly indicated by prior art.

The Clark patent discloses three methods of initiating regeneration of the softener: (1) by closing of a time clock switch after lather failure; (2) closing of manual switch after lather failure; (3) by the breaking of the electric circuit upon lather failure, which is the method to which the claim in suit is directed, in which regeneration is initiated automatically when the water discharged fails to give a good soap test.

■ The light sensitive turbidity test unit of Poynette (which is entirely filled with water, without air, so the formation of lather is prevented), does not interrupt or break any circuit when the test unit detects hard water, and is not arranged or adapted to start the motor to commence regeneration as in the Clark patent. It

simply lights the warning lamp. No features of Clark were appropriated by Poynette, but were all found in prior art, and there is no infringement of the claims of the Clark patent in suit.

The Sweeney & Clark patent in suit discloses a zeolite softener and the use of a light sensitive turbidity hardness tester for starting the regeneration cycle of a water softener by closing the circuit through which the water softener motor is energized, when hardness in the water is detected.

■ Poynette follows the teachings of the prior art and not those of Sweeney & Clark, and does not infringe the claims of the Sweeney & Clark patent in suit.

Dotterweich claimed an electrical control device operating a zeolite water softener upon the conductivity of water principle, not found in Poynette.

Clark did not change the softener, but devised a type of electrical control device operating a softener upon the soap test principle to control the regeneration cycle which initiated the regeneration upon delivery of hard water from softener to service. Clark claimed the combination of this unit with a zeolite softener, which combination had been exhausted by the issuance of the Dotterweich patent. Consequently, Clark's claim 14, which attempted to repatent the combination, was invalid, as claiming a combination which he did not invent.

In Dotterweich, Clark, and Sweeney & Clark, the function of the tester was to close an electrical circuit upon the detection of a pre-determined water condition and thereby initiate the regeneration cycle. In Poynette, as stated, the test unit simply lights a warning lamp, and the regeneration is initiated by hand.

■ The claims in suit of the Clark and the Sweeney & Clark patents are invalid as defining an exhausted combination, in that they claim more than the applicants invented. A patentee cannot, by improving one element of an old combination whose construction and operation is otherwise unchanged, in effect repatent the old combination by reclaiming it with the improved element substituted for the old. Bassick Manufacturing Co. v. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251; Lincoln Engineering Co. v. Stewart-Warner Corporation, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008.

[8] The addition of a new and useful element to an old combination may be patentable, but the addition must be the result of invention rather than that of the exercise of mere mechanical skill, and not one plainly indicated by the prior art.

Chart D—265 shows eight prior patents of light sensitive test units for testing turbidity or opaqueness of fluids and actuating warning signals or control mechanism in response to changes in the tested fluid, all operating upon the same general principle as the test unit disclosed in the Sweeney & Clark patent in suit.

In the Riche patent a signal bell is sounded; in Poynette a signal lamp is used.

The Simsohn, Edelman and Dotterweich patents all disclose test units of the conductivity type. In Simsohn and Edelman, they are connected to a lime-soda softener; in Dotterweich to a zeolite softener.

The Steinmuller and Riche patents disclosed light sensitive turbidity testers.

Sweeney & Clark could have made their selection of softener and type of tester from prior art. They did not invent the softener, nor did they discover that a light sensitive cell may be used to operate an electric switch. This principle was disclosed by Riche in his application for a patent which antedated the filing of the Sweeney & Clark application and constitutes prior art, which invalidates the claims of the Sweeney & Clark patent in suit. The same principle was disclosed by Logan and Steinmuller prior to the filing of the Sweeney & Clark application.

Defendant's result is substantially different from that of Dotterweich, and is produced by a different method of operation resulting from a totally different structure. Poynette brine valve operates in a different manner than Dotterweich. It operates by its own motor, which is not controlled by the pilot stager in any manner. Its brine valve motor is energized to open the brine valve by the turbidity tester when the effluent runs clear at the finish of the "backwash", and is energized to close the brine valve by the lowering of the brine level in the brine tank, at a time when no movement of the pilot stager, the pilot valve or the pilot controlled valves occurs.

The Poynette light sensitive turbidity tester is not a soap test unit as disclosed in Clark patent in suit.

The claims of the Pick patent in suit covering a valve system are invalid because they claim a structure not shown or described in the specifications and define no invention over the prior art, including the prior knowledge and invention of Steinberg disclosed in Steinberg's patent. That which is obvious to persons skilled in the art or is the product of mechanical skill is not patentable. It is elementary that a new use of an old device or a mere substitution of mechanical equivalents does not constitute invention. Pick exercised no inventive skill, but simply applied mechanical skill to that which was plainly indicated by the prior art, and the claims of the Pick patent are invalid. Keystone Co. v. Northwest Engineering Co., 294 U.S. 42, 55 S.Ct. 262, 79 L.Ed. 747; State Bank of Chicago v. Hillman's, 7 Cir., 180 F. 732.

To establish infringement, there must be identity of means, operation and results. Weil Pump Co. v. Chicago Pump Co., 7 Cir., 74 F.2d 13. The means and operation in Poynette are substantially different than those found in the claims of plaintiff's patents in suit.

The claims of plaintiff's patents in suit are invalid for the reasons hereinbefore stated.

The defendant has not infringed any of the said claims of said patents in suit.

Judgment may be entered dismissing plaintiff's complaint, with costs.