57 CCPA

**Application of Joseph Francis SKRIVAN.**

**Patent Appeal No. 8300.**

United States Court of Customs and Patent Appeals.
June 25, 1970.

---

Theodore C. Virgil, Stamford, Conn., W. P. Spielman, Washington, D. C., Roland A. Dexter, Harry H. Kline, Stamford, Conn., attorneys of record, for appellant.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. L. F. Parker, Arlington, Va., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

Skrivan appeals from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, which affirmed the final rejection of claims 9–16, all of the remaining claims in his application,[1] on the ground of double patenting over his own patent.[2] Claims 9, 10 and 12–16 were rejected additionally as being "unduly broad" under 35 U.S.C. § 112. We shall consider each rejection separately.

## THE DOUBLE PATENTING REJECTION

The varying positions taken by the Patent Office during the prosecution of the claims on appeal reflect some of the confusion which existed before, and, hopefully, has since been clarified by, our latest opinions in this area of the law.[3] Restating those positions or setting out the language employed will serve no useful purpose in the disposition of this appeal. We note that a terminal disclaimer has been filed by appellant and was given consideration

---

1. Serial No. 480,494, filed Aug. 17, 1965, for "Oxide Process".

2. U.S. Patent 3,275,412, issued September 27, 1966, on an application filed February 4, 1965.

3. In fairness, it must be stated that a number of the opinions referred to were handed down after the administrative proceedings in this case.

by the Patent Office. Our only concern therefore, need be a determination of whether any substantive difference exists between the subject matter of the claims on appeal and that claimed in appellant's patent or whether the only difference is in the language of the claims, in other words, whether the differences "are sham or real, semantic or actual." In re Plank, 399 F.2d 241, 55 CCPA 1400 (1968).

Skrivan's patent and the application presently before us are both directed to improvements in the so-called "plasma jet" process for the preparation of metal oxides, such as titanium dioxide, in finely divided form so as to be useful as pigments. That process is broadly described and its advantages summarized in the following passage taken from the patent disclosure:

> [O]xide powders, particularly titanium dioxide, [can] be produced without utilization of an auxiliary burning gas and with reduced amounts of nucleating agents by conducting the oxidation of a metal or metalloid salt with a plasma jet generator. By this method, a gas is passed through a high energy electric arc and the resulting plasma (the term "plasma" being employed to designate a very hot, partially ionized gas stream) is contacted with the material to be oxidized and oxygen. The plasma is thus the source of heat for raising the reactants to a temperature at which oxidation is initiated. No by-products of burning are introduced into the gas stream and, thus, problems above associated with the prior art methods are obviated.

According to the patent disclosure, the basic plasma-jet process had certain inherent disadvantages. These disadvantages are allegedly overcome by the process of the patent which, in concept, involves first separately mixing one or both of the reactants with a plasma stream and then combining the two streams after the reactants have, in combination, been heated by the plasma sufficiently to bring them to reaction temperature. The disclosure goes on to state that in order to properly mix the reactants, maintain a relatively constant particle size distribution of the product, and prevent reactor plugging, the streams must be combined at an angle of between about 25° and 160°, preferably between 70° and 120°. An example in which the two reactant streams were made to meet head-on, i. e., to combine at 180° was said to require discontinuation after only 62 seconds of operation "due to the growth of a very hard granular deposit of titanium dioxide" in the area at the point of contact. It is also stated that if the angle of combination is too low the streams will not properly mix with each other.

The disclosure of the application at bar substantially duplicates the patent disclosure. The issue on which appellant and the Patent Office are at loggerheads revolves around the single difference, relating to what is included in the oxygen-containing stream. The patent disclosure very specifically states that

> The amount of oxygen used will, in the first instance, depend upon the stoichiometry of the reaction. For practical results, at least a stoichiometric amount should be used based upon the salt to be oxidized. It is normally desirable to have an excess of oxygen available for reaction. This excess can, without practical inconvenience, be as high as 100% by volume, or even higher. More usually, a 15–50% by volume excess of oxygen is employed with good results.

The application, on the other hand, contains the following recitation:

> It is a particular feature of this invention that air is used to supply a part or all of the oxygen for oxidation of the metal or metalloid salts. It has been found that the control of particle size of the oxide can be achieved and maintained during the reaction by adjusting the amount of oxygen available. This is preferably done by use of air in place of pure oxygen. Decreased amounts of oxygen admixed with nitrogen can also

be used. It is also possible to employ part of the off-gas from the reaction.

The amount of oxygen used will, in the first instance, be dependent upon the stoichiometry of the reaction. For practical results, at least a stoichiometric amount of oxygen should be present as based upon the salt being oxidized. It has in the past, been thought desirable to have an excess of oxygen available during the reaction. Excesses of 5 to 100% by volume have been recommended in the past. Using air, or other diluted oxygen mixtures, only the amount of air or such mixture required to give the stoichiometric amount of oxygen need be used. At most, an excess of 5% by volume of oxygen in the mixture is desirable to attain the benefits of the present invention. It is highly desirable to employ the dilution effect of the inert fluid, i. e. nitrogen, either pure, or as found in air, instead of, as in the past, using excess oxygen. It is also possible to use other inert gases such as recycled off-gas recovered from the reaction zone and freed of oxide product.

Claim 1 of the patent (the broadest) follows:

1. In the process of continuously preparing finely divided refractory oxides by contacting an oxygen-containing stream with at least one stream of at least one member selected from the group consisting of vaporous metal and metalloid salts, the improvement which comprises admixing at least one of said reactant streams with a stream of gaseous fluid heated by means of a plasma generator to a temperature in the range of 3,000°–12,000°C., contacting said reactant streams flowing at an angle with respect to each other of between about 50° and 160°, passing the resulting mixture of reactants to a reaction zone for a period of about .001 to 1 second, and then collecting the resultant oxide product.

Patent claim 6 is narrower in most respects than claim 1 and, in particular, recites that the oxygen-containing stream contains "at least a stoichiometric amount of oxygen."

Basic claim 9 on appeal defines what appellant regards as his invention thusly:

9. In the process of continuously preparing finely divided refractory oxides from reactant oxygen and at least one reactant selected from the group consisting of vaporous salts of silicon, titanium, aliminum, zirconium, iron and antimony, wherein at least one of the reactant materials is admixed with a stream of gaseous fluid heated by means of a plasma generator to a temperature in the range of 3,000°–12,000°C., and the reactants are combined and passed into a reaction zone for a period of about 0.-001 to 1.0 second to give the oxide product;

the improvement which comprises using an oxygen-containing reactant stream consisting essentially of (a) 100–105% of the stoichiometric amount of oxygen based on the vaporous salt and (b) about 10–150%, based on oxygen, of a gaseous diluent which is inert under reaction conditions.

It is asserted in behalf of the Patent Office that the invention claimed in the instant application must be considered the same invention as that claimed in the patent when full consideration is given to what the language in the patent claims actually means. The expression "at least a stoichiometric amount of oxygen" of the patent claims, when read in light of the patent disclosure, quoted above, it is argued, "[I]mplies the minimum and obviously comprehends a slight increase of oxygen over 100%, for example up to 105%." As to the second language difference, i. e., that the oxygen-containing reactant stream also consist of

(b) about 10–150% based on oxygen, of a gaseous diluent which is inert under reaction conditions,

it is argued that the recited claim language adds nothing to the process in the patent. It is pointed out, for example, that in patent claim 6, the plasma stream, which is an enert gaseous diluent, is mixed with the oxygen containing stream prior to reaction and that the quantity of inert fluid in the total mixture is about 3% to 95% by volume, which "is clearly within the range of that called for by the [appealed] claims." It is strongly urged that no matter what appellant has stated in his specification or argued in his briefs to the effect that the invention of the claims on appeal "adds a step to the patented process; namely the introduction of an inert gas into the oxygen-containing reactant stream," the language of the patent claims and the claims on appeal does not bring this difference out.

■ We have some sympathy with the arguments of the Patent Office regarding the language of the claims. At times it does become difficult to distinguish between the inert gaseous fluid which becomes the plasma, the inert gaseous fluid which serves as a diluent, and whatever else is in the "oxygen-containing stream" recited in both the patent and application claims. Nevertheless our decision does not require an interpretation of all the language in the claims. It is readily apparent that the appealed claims are very narrow in the recitation of the amount of oxygen employed. The patent claims, on the other hand, recite no upper limit on the amount of oxygen used, and we are not about to imply one. Thus the claims, at least in this regard, define admittedly overlapping, but different subject matter. This is enough, under the law as it now stands, to warrant giving effect to a terminal disclaimer. The rejection on double patenting grounds has, in view of the disclaimer, been obviated and is, therefore, reversed.

### The Section 112 Rejection

The board sustained this rejection "for the reasons stated in the Examiner's Answer." Considering the examiner's position, it appears that he was concerned with the fact that there was no specific recitation in the rejected claims of the angle at which the two reactant-containing streams are to be combined before being passed into the reaction zone. We quote his reasoning:

Claims 9, 10, and 12–16 inclusive are deemed unduly broad, 35 U.S.C. 112, since these claims are readable on a minute angle, such as 1°, 2°, etc. or a large angle of 180°, and it is clear from the specification page 6, for example, that the actual range employed to *prevent* plugging, undesirable size classification, etc. is *within* the range of about 50°–160°. * * The Y type of reactor "of co-pending application Serial No. 430,262, filed February 4, 1965" aforementioned is employed by the appellant in this case. It is to be noted that in all of the *claims* in said case that the angle is [between] about 50° and 160° or of more limited range. Such limitations in the claims of said co-pending case were made by amendment after extended prosecution therein and as the apparent result of a similar holding by the Examiner of undue breadth of the claims in said co-pending application.

We have considered the examiner's rejection in the light which the arguments of the parties have placed it, but find ourselves unable to agree that the limitation which the examiner would have appellant recite in his claims is necessary.

Initially we point out that the absence of such limitation does not make the claims indefinite. Furthermore, as is evident from the "Jepson" style of the claims, the manner in which the reactants must be combined has not been relied on to distinguish over the prior art. Nor has appellant, either by statements made in his disclosure or by his attorney during the course of prosecution, indicated that the claims define anything more than he regards as his invention. Cf. In re Borkowski, 422 F. 2d 904, 57 CCPA (1970); In re

Prater, 415 F.2d 1393, 56 CCPA 1381 (1969).

Finally, we emphasize that the disputed limitation deals only with a physical operating condition of an admittedly old process. We see no more reason for requiring that appellant recite the specific angles at which the reactants in his process are to be combined than we do for requiring the recitation of flow rates or size of reactor or any other physical operating condition which might be required in order to obtain an operable process. Those limitations deal with factors which must be presumed to be within the level of ordinary skill in the art. We hold that claims need not recite such factors where one of ordinary skill in the art, to whom the specification and claims are directed, would consider them obvious.

The decision of the board is reversed.

Reversed.